treated that particular patient, and then also the independent institutional negligence, which is how the courts have talked about it, about failure to adopt certain policies. And in Theophilus, it was the failure to ascertain that pre-cortal stethoscopes were used in all pediatric surgeries. And in May, it was about setting policies about excessive narcotics. So it is, to the extent that medical malpractice is a subset of negligence, I agree that they are related, but the Michigan courts have also recognized them as two separate strands, one which can be brought against individual doctors and nurses for care for that particular patient, but then also an independent institutional or corporate negligence against the institution for failure to set the appropriate policies or for setting policies that harm patients. What would happen if a hospital board, you claim that they were negligent in credentialing a doctor who in fact caused some kind of an injury to the person? Is that medical malpractice or is that just plain old negligence? Well, Your Honor, I think that might actually be negligence, and that's very similar to a case that we cited in our briefs. If I can find it, it might have been the... But there has to be, for something like that, there has to be an underlying medical malpractice. If they negligently credentialed some doctor who didn't hurt anybody, there's no cause of action, is there? Well, that is true, Your Honor, but I think that the question is whether by setting the policy, or in your hypothetical, credentialing a doctor, was it foreseeable that that doctor would harm patients? And in our case, the question is whether it's foreseeable that the policy would harm patients. And in this case, it did. And in fact, the hospital has said that the reason why they did not provide Ms. Means with appropriate care during her miscarriage was because of the policy. And so in effect, the policy tied Ms. Means' doctor's hands to be able to provide her for the appropriate care. So the policy makers are the important individuals to hold accountable here because the doctors were simply following policy and prohibiting the proper care in this circumstance. And this is really actually common sense. If the defendants had instead set a policy that prohibited blood transfusions, and a patient was denied a blood transfusion and was harmed, the policy makers should be held accountable under an independent claim of negligence. And that is the same exact situation that we're talking about here. I don't even understand how the directive at issue necessarily would compel the negligence or actions of the doctors in this case. I mean, the directive doesn't speak to anything about what advice you're to give a patient and what her complaint ultimately is, is that they didn't tell her, not that they didn't provide services to her, but that they didn't really didn't tell her, didn't give her the full picture when she first went to the hospital. Is that the nature of the claim? Your Honor, I think the nature of the claim is twofold. And I think the directives do speak to both of them. So one is, you're exactly right, the lack of information about her condition and treatment options. And the second is offering to provide her appropriate care. When a woman who is miscarrying is developing chorioamnuitis, which is a serious infection that can be life-threatening, the proper course is to terminate the pregnancy. They never offered that to Ms. Means. And so the directives speak to... Well, is there indication? I mean, we're getting into what you might establish if you had a claim and you went to trial. But I can't help but ask, was the risk greater to her or did she suffer because the baby died shortly thereafter than she would have suffered? I mean, was the harm to her health greater? Yes, Your Honor. By continuing to prolong the pregnancy, the treatment for a woman who is developing chorioamnuitis is to remove the fetus to be able to then... Okay, that's the treatment itself. Correct, Your Honor. Correct. And also in this circumstance, she was only provided treatment upon being discharged for the third time when the feet of the fetus started to exit her cervix. So she was delivering breach while she was being discharged. And that obviously would not have been happened if she had been provided with proper care in the first instance. But to get back to your original question about where do the directives speak to our claims, one in terms of the information that we believe that Ms. Means should have received but did not because of the directives would be in Directive 27 that says that free and informed consent requires that the person receive all reasonable information as long as they are reasonable, morally legitimate alternatives. And the directives talk in several places about how abortion is not a moral act. And so therefore, information about abortion is not permitted under the directives. And then Directive 45 says that abortion essentially is never permitted. And the question here is less about the interpretation of the directives by a Catholic theologian or a religious scholar. It's about what a doctor would think he or she was allowed to do. So is your premise that regardless of the religious foundation and the principles, the religious principles upon which the hospital is founded, regardless of what those permit, this treatment has to be available to anyone who comes into the hospital? In certain circumstances, Your Honor. So when a woman is miscarrying and she is in... But she didn't actually technically miscarry. She delivered a live child. Before viability, Your Honor, and that is the definition of miscarriage. Before a fetus is capable of living outside the womb and a woman loses that pregnancy, that is a miscarriage. I see my time is up, but just to finish the thought. When the Emergency Medical Treatment and Active Labor Act is a federal law that requires all hospitals that take federal funds, and all emergency rooms do, to provide emergency care to all patients. And there's no exception for women who need an abortion in an emergency.  Regardless of the religious affiliation of the hospital, when women need to be stabilized, when they need to be provided with emergency treatment, and that treatment is the termination of that pregnancy, then yes, the hospital must provide that treatment. Thank you. Thank you. Good morning. My name is Cameron Ghetto. I represent the U.S. Conference of Catholic Bishops. I'm here to tell you that there's no precedent in the Sixth Circuit or in any other circuit that we could find that has endorsed the personal jurisdiction position that has been asserted by plaintiff in this case. This is because none of the traditional ties that we see over and over and over in personal jurisdiction cases are present here. I'm not going to list them all. They're all in the affidavit. They've been cited in briefs. But the USCCB is... So here's my question. Yes. And I have yet to figure out the answer, so maybe you will. If, according to Sixth Circuit precedent, there hasn't been an evidentiary hearing on the subject of personal jurisdiction, even though there's been discovery and there's all kinds of evidence in the record, if under our precedent, under those circumstances, the standard is that the plaintiff only needs to make out a prima facie case, does that permit the court to actually look at the evidence which is contrary to the plaintiff's evidence? Because you can't weigh it. You can't use a preponderance standard. I would respectfully suggest that if the court examines the well-pled complaint here, the court doesn't even need to look at the evidence. If the court looks, for example, at the complaint on page 4 in paragraph 11, plaintiff alleges in the venue and jurisdiction section of the complaint that the decision that MHP would adhere to the ethical and religious directives was made by CHM. To me, that's dispositive of the jurisdictional notion because what plaintiff has essentially admitted and alleged in their complaint is that this decision wasn't made by the USCCB in Michigan. This decision was made by CHM in Michigan, and therefore, there's no connection between the mere fact that the USCCB authored these directives. Wouldn't the question, though, be, if you go back to our Mohasco case, wouldn't the question be whether the Catholic bishops sitting in Washington and promulgating the directives purposefully availed, well, the organization, purposefully availed itself of the privilege of acting or causing a consequence in Michigan? That is exactly the question, and in fact, when I was preparing for this argument, I pulled a number of personal jurisdiction opinions from the Sixth Circuit, and some of your honors here have signed on or wrote some of those opinions, and Southern Machine versus Mohasco is front and center in virtually every single one of those opinions. There is no purposeful availment here because all the USCCB did was it wrote down its expression of Catholic doctrine, its expression of religious principles. If the Catholic Church sincerely and deeply believes, it wrote them down as guidance for any individual who's interested in knowing what Catholic doctrine advises with regard to healthcare, and of course, one of those principles is direct abortions are never permitted, but if you read the directives themselves, a loss of life of the fetus is permitted if there's a direct threat to the life of the mother. Does that really include a direct abortion? No, direct abortions are not permitted. Part of the Catholic Church's teaching, and part of the... So the claim here is that because of the circumstance of the mother, she should have been provided an abortion, not some other, not, for example, administration of antibiotics to attack the infection, even though that might have resulted in the death of the fetus or the child. That, I mean, I agree wholeheartedly with your honor's statement. The problem with the plaintiff's allegations is that these are allegations that relate to doctors and what doctors do. They're not allegating, they don't relate to what bishops do. Bishops simply say, this is what the Catholic teaches. This is what the Catholic Church teaches. Well, I would say a little more than that. I mean, they are expecting that Catholic hospitals will adhere to the directive. I mean, it may not be enough. Yes, they do say that, I think. They're not, I mean, it may or may not be enough for personal jurisdiction, but it seems to me it doesn't tell us the whole story to say that the Catholic bishops are only telling us what they think. I mean, that, you and the bishops intend this to have effect throughout the United States or wherever they, correct? As with any sincere expression of religious belief, it is their hope that Catholic doctors and Catholic healthcare systems will follow the directive. Catholic healthcare services must adopt these directives as policy, require adherence to them within the institution as a condition for medical privileges and employment, and provide appropriate instruction. That's in the directive too, isn't it? That is there, but I realize my time is up. To finish that thought and answer the question, there's no mechanism for enforcement of this. This is an expression of belief. That brings back to my question, which is, can we consider the affidavit of Ms. Hunter Hunt? Linda Hunt. Linda Hunt. Can we consider that affidavit when looking at the question of whether a prima facie case has been made for personal jurisdiction? I think you can, but I think if you focus exclusively on plaintiff's complaint, you get to the same outcome anyway. That's my answer. Well, I would just real quickly, I would say that where I'm struggling with that is, you look at paragraph four, and I'm looking at paragraphs 62 and 63, and 63 says directive five required MHP to adhere to all of the directives. So that's a pretty clear statement that the directives promulgated in Washington by the bishops required adherence. So if we're only able to look at a prima facie case, I'm struggling with how the Hunt affidavit does anything for us. I would direct your attention back to paragraph 11. This decision was made in Washington, D.C., and the personal jurisdiction analysis looks at what the conference did and where it did it. It doesn't look at the decision made by MHP and where MHP did it. It doesn't look at the purposely availed itself of the opportunity to cause a consequence in the jurisdiction? No, because the relationship is too attenuated. In all of the cases, there is some kind of physical sending of a document or some kind of a contract or some kind of business relationship that causes a purposeful availment of the benefits and the protections of the law of the forum state. We don't have that here. We have an expression of religious principle in D.C. You're saying that nowhere in the complaint is there an allegation that the bishops actually sent this anywhere? Correct. Thank you. Thank you. Good morning. I'm Thomas Van Dusen. I represent the three individual defendants, Mary Mollison, Robert Lattenberger, and Stanley Urban. I'm with my partner, Dennis Levasseur, who accompanied me here today. Defendants are requesting the court to affirm the dismissal of plaintiff's complaint for failure to state a cause of action. These three defendants, Mary Mollison, Mr. Urban, Mr. Lattenberger, are only three of many individuals who served as members of Catholic Health Ministries over a period of time. And Catholic Health Ministries, as I'm sure this court is well aware, is a public juridic person, which means that it is an official Roman Catholic entity, which was created by the Vatican. Is it a corporation? A not-for-profit corporation? Yes, Your Honor. It's an unincorporated association. Unincorporated? Yes. Created by the Vatican. Yes. Now, the single claim that's been asserted by plaintiff against the individual defendants is a claim of negligence under Michigan law. And the claim specifically is that these three members, three of many members, but these three members were negligent in adopting the directives. And specifically, the act of negligence that plaintiff identifies in her complaint comes from the canonical, these are canonical bylaws of Catholic Health Ministries. And plaintiff attaches these bylaws as an exhibit. And the act of negligence, according to plaintiff, is as follows. Catholic Health Ministries will adhere to the ethical and religious directives for Catholic healthcare services promulgated by the U.S. Conference of Catholic Bishops as interpreted by the local ordinary. So that is the allegation of negligence against my clients, the three individual defendants. And I think it's fair to say that no court in the state of Michigan, or to my knowledge in this country, has ever recognized a negligence action against individual members of a religious sponsor of a Catholic hospital for adopting policy. The cases that plaintiff has cited to establish the existence of this so-called duty are all medical malpractice cases. And plaintiff claims that the harm that she sustained in this case is substandard medical care. But as I think was pointed out in some of the questions that were asked of plaintiff's counsel, even though this case, even though supposedly, according to the complaint, the central fact in this case is substandard medical treatment, plaintiff did not sue the hospital where she was treated. Plaintiff did not sue the doctors who treated her. And instead, rigged together this diversity case and tried to assert the cause of action that way. Is this case different from that Theophilus case which has been cited? Yes. I'm sorry, your honor, to interrupt you. Yes, your honor. How is it different? Well, probably the first difference is that in Theophilus, the defendant was the hospital. So the defendant, Theophilus, was the equivalent of Mercy Health Partners, which is the hospital in Muskegon. That hospital is not named in this case, number one. And then number two, the Theophilus case, your honor, involved a medical malpractice claim. And the other defendants were the doctors and the nurses. So that was a medical malpractice claim. So clearly in that case, there was evidence of a duty because of all the factors that go in under Michigan law to determine whether such a duty exists, existence of a relationship, control, foreseeability, and the trial court found, and we are respectfully asking this court to affirm that, the trial court found that none of those factors exist here. And that's why the court found, as one reason for granting the motion to dismiss this to my individual clients, that there was no evidence of negligence under Michigan law. The court, I think, emphasized that the connection, the so-called connection between plaintiff and whatever injury she may have sustained, on the one hand, and whatever actions these three individual defendants may have engaged in in adopting these religious doctrines as policy for Trinity Hospital, that that connection, whatever you may describe it, was so attenuated that it could not under Michigan law serve as a basis for a negligence action. So for that separate reason, the court found under Michigan law that there was no cause of actions stated for negligence, and the court granted the motion for that reason. The second ground for granting the motion to dismiss was, of course, the constitutional issues, which we would point out that those issues do not necessarily have to be addressed by this court. I think that this decision by the trial court can and should be affirmed based on the analysis of Michigan law that was undertaken by the trial court. But if the constitutional law issues need to be addressed, what the trial court found was that the claims that have been asserted by plaintiffs violate the church autonomy doctrine, which I know this court is very familiar with. There is no question that this case, just look who the defendants are, there is no question that notwithstanding the statement that this case is about substandard medical care, this case is 100% about an attempt to challenge religious policies in a Catholic hospital. And I think many courts have found over and over that the existence of religious doctrine for plaintiff to have a court conduct the far-reaching interpretation of her so-called cause of action would necessarily require, in our view and in the view of the trial court, extensive interpretation of religious doctrine. There is no dispute that these directives are religious doctrine. There's no dispute on that. The party that adopted the directives, Catholic Health Ministries, no dispute are religious entity. So we believe respectfully that for a separate reason the case should also be affirmed on First Amendment grounds because the type of analysis that plaintiff is requesting would violate constitutional principles and therefore the First Amendment. So we're asking this court please to affirm the decision of the trial court. Thank you. Your Honor, just two points, Your Honor, just two points on rebuttal. The first on personal jurisdiction, this court's decision air products I think speaks to some of the court's questioning about weighing the assertions of the defendant. And in that case, this court said that the plaintiff bears the burden of establishing jurisdiction true. But if there has been no chance for discovery or an evidentiary hearing, this burden is relatively slight and the plaintiff is only required to make a prima facie showing that personal jurisdiction exists. And the pleadings must be viewed in the light most favorable to the plaintiff and the district court should not weigh the counter, controverting assertions of the party seeking dismissal. In our complaint, we allege that the USCCB as your. Let me ask you a question and this is one that I should know the answer to but don't. So you can help me out here. Was there any discovery here on the jurisdictional issue or do we just have the plaintiff's complaint and the affidavit that was submitted by the bishops? Your Honor, there has been no opportunity for discovery, no evidentiary hearing. I know there was no evidentiary hearing but my question was because that affidavit is part of this and the directives themselves of course were before the district court but there was no actual discovery that was undertaken? No, Your Honor. We asked for discovery and we were not permitted to. Okay. Thank you. So there... Does now a discovery relate to the jurisdictional issue or is it a broader ruling? It was, we asked for it and we, in the context of our opposition to the motion to dismiss, we asked in the alternative for an opportunity to do discovery limited to this question and I don't believe, Your Honor, that the district court actually addressed it but it was therefore implicitly denied. And if this court is going to look outside the four corners of the complaint, first of all, we believe that we pled personal jurisdiction against USCCB in the complaint by saying that the directives are mandates. They are mandates that are set by the Conference of Catholic Bishops that require all Catholic hospitals to provide, to prohibit certain care  There doesn't need to be anything physically sent in the mail or transmitted by fax. These were requirements that all Catholic hospitals abide by them and the USCCB knew that there were Catholic hospitals in Michigan, therefore they purposefully directed their activities towards Michigan. And Ms. Means' claim arises from the purposeful direction of those activities because it was the policy, according to the hospital, that prohibited them from providing Ms. Means with appropriate care. But I do want to point on this court, if this court is going to look outside the four corners of the complaint, in addition to the Linda Hunt affidavit. Is there any conflict between your saying that the action of the bishops, of the Conference of Bishops, was purposeful for purposes of the jurisdictional issue but was negligent for purposes of the underlying cause of action? Your Honor, I don't believe that there is a conflict there. The purposeful direction, I believe, is a different inquiry, separate and apart from any sort of intentional tort. And so I don't think that there is any conflict there. I see my time is up, but if I may, I just wanted to point the court to, in addition to the affidavit cited by the defendants, I wanted to also point this court to what we cited in our brief about some external evidence that shows that USCCB knew that Trinity Health Michigan, which is Mercy Health's parent corporation, had hospitals in Michigan. They were listed in the official Catholic directory. And according to USCCB's tax-exempt letter, the official Catholic directory shows the names, addresses of all agencies. If you didn't have any discovery, how is this before us? Well, Your Honor, I'm just saying if you look outside the four corners of the complaint, this was information we were able to obtain publicly, and we put it also before the district court. I don't believe you need to look outside the four corners of the complaint for us, for you to determine that there's personal jurisdiction. But if this court were, I wanted to provide a counterbalance to the Linda Hunt affidavit. And so that is in the record, docket 46-11. All right. Thank you. Thank you very much. The case will be submitted, and the clerk may call the meeting.